UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

THE CINCINNATI INSURANCE COMPANY,

    Plaintiff,

v.                                           Case No. 07-C-648

HERESITE PROTECTIVE COATINGS, INC.,
SC (CALGARY) LEASEHOLDS, INC., and
WINDMILL MECHANICAL SERVICES, INC.

    Defendants.

---

### DECISION AND ORDER

---

This is an action for declaratory relief in which Plaintiff Cincinnati Insurance Company ("Cincinnati") seeks a determination that it has no duty under its Commercial General Liability Policy to defend its insured, Heresite Protective Coatings, Inc. ("HPCI"), in a Canadian lawsuit in which HPCI has been sued for losses arising out of the premature failure of components of a HVAC system for a commercial building located in Alberta, Canada. HPCI designed the coating for the components that allegedly failed. Cincinnati also seeks a determination that it has no duty to indemnify HPCI for any damages for which HPCI may found liable in the Canadian action. The case is presently before me on Cincinnati's motion for summary judgment. In addition to a determination that it has no duty to defend and there is no coverage under its policy, Cincinnati seeks dismissal of HPCI's counterclaim that Cincinnati's denial of coverage was made in bad faith. For the reasons that follow, Cincinnati's motion will be granted.

**I. The Canadian Lawsuit**

On October 13, 2006, SC (Calgary) Leaseholds, Inc., and Windmill Mechanical Services, Inc. (collectively "Calgary") filed suit against HPCI and Airtex Manufacturing Partnership (known by its tradename "Engineered Air") in the Court of Queen's Bench of Alberta, Judicial District of Calgary. (Decl. of Mark W. Rattan, Ex. A.) The lawsuit alleges that in 1999, Calgary decided to replace the air handling cooling coils for the HVAC system at the Shell Centre office building, which Calgary leases. As an alternative to the original copper cooling coils, which consisted of copper tubing with copper fins (copper-on-copper coils), Engineered Air offered to install a less expensive product: copper tubing with aluminum fins coated with a product called Heresite (Heresite coils). (*Id.* ¶¶ 6-7.) Heresite is an industrial coating designed and sold by HPCI, and Engineered Air was HPCI's licensee for the manufacture and application of Heresite in the Canadian Province of Alberta. (*Id.* ¶ 5.) Calgary alleges that Engineered Air and HPCI made representations that Heresite Coils were superior to copper-on-copper coils, that they would withstand the harsh conditions inside the air handling units, and that they would provide a more economical choice than copper-on-copper coils without reducing the expected life cycle of twenty-five years. (*Id.* ¶¶ 11, 22.) In reliance upon these representations, Calgary alleges that it elected to install the Heresite Coils. (*Id.* ¶¶ 14, 22.)

Calgary alleges that the Heresite Coils, which were manufactured by Engineered Air using HPCI's proprietary process, were installed in the Shell Centre HVAC system from December 1999 through August 2000. (*Id.* ¶¶ 9, 14.) Notwithstanding the representations made by Engineered Air and HPCI, Calgary alleges that it discovered that the Heresite coating was beginning to peel off the fins of the coils in December 2004. (*Id.* at ¶ 16.) Although the cause of the failure has not been

2

conclusively determined, Calgary claims that the coils continue to peel, the peelings are accumulating in the air handling units, and the exposed copper coils have substantially deteriorated after only five years of use. (*Id.* at ¶¶ 16-17, 19.) Due to this deterioration, the cooling coils will again need to be replaced. (*Id.* at ¶ 27.)

Calgary claims that the representations HPCI made concerning Heresite and its suitability as a coating for HVAC components were false. (*Id.* at 22-23.) Calgary also claims that HPCI "owed a duty of care to all foreseeable users of Heresite . . . to take all reasonable steps to ensure" that Heresite was designed and applied to withstand the conditions of the environment for which it was marketed, licensed only to those capable of applying it properly, and met the specifications and requirements set forth in HPCI's marketing materials. (*Id.* at ¶ 23.) Calgary further claims HPCI knew that there were peeling problems with Heresite coating prior to the time Heresite coated coils were installed at the Shell Centre, but failed to warn foreseeable users of such problems or prevent its licensees from selling Heresite coated products. (*Id.* at 25-26.) Calgary seeks damages approaching $900,000 for the costs of removing the Heresite coils and replacing them with copper-on-copper coils and related expenses. It is this claim that Cincinnati contends is not covered under the Commercial General Liability Policy its issued to HPCI.

**II. Analysis**

    **A. Summary Judgment Standard**

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp.*

3

*v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24. Summary judgment can be particularly appropriate in contract actions where the disposition of the case involves the interpretation of a contract. *Tingstol Co. v. Rainbow Sales Inc.*, 218 F.3d 770, 771-72 (7th Cir. 2000). In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48.

### B. Interpretation of Insurance Policies

Under Wisconsin law, insurance policies are contracts, and so are governed by the same rules that govern the interpretation of contracts in general. *Smith v. Katz*, 595 N.W.2d. 345, 350 (Wis. 1999). The construction of a contract is a question of law. *Elkhart Lake's Road Amer. v. Chicago Hist. Races, Ltd.*, 158 F.3d 970, 972 (7th Cir. 1998). Judicial interpretation of a contract, including an insurance policy, seeks to determine and give effect to the intent of the contracting parties. *Wisconsin Label Corp. v. Northbrook Property & Cas. Ins. Co.*, 607 N.W.2d 276, 282 (Wis. 2000). Insurance polices are construed as they would be understood by a reasonable person in the position of the insured. *Kremers-Urban Co. v. American Employers Ins. Co.*, 351 N.W.2d 156, 163 (Wis. 1984). However, an insurance policy should not be construed to provide coverage for risks that the insurer did not underwrite and for which it has not received a premium. *Wisconsin Label*, 607 N.W.2d at 283.

Under Wisconsin law, a court's first step in a coverage dispute is to "examine the fact of the insured's claim to determine whether the policy's insuring agreement makes an initial grant of coverage." *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 24, 268 Wis. 2d 16, 673 N.W.2d 65. If the agreement makes no initial grant of coverage, the analysis ends there; if there is an initial grant of coverage, however, the court then examines the various exclusions to see whether any of them preclude coverage. *Id.* Exclusions are strictly construed against the insurer if their effect is uncertain, and a court is to analyze each exclusion separately. *Id*. An insurer may decline a defense when there is no arguable coverage under an insurance policy, *Radke v. Fireman's Fund Ins. Co.*, 217 Wis. 2d 39, 47, 577 N.W.2d 366, 370 (Wis. Ct. App. 1998), but has a duty to defend where it is "fairly debatable" whether the allegations of the complaint, if proved, would lead to a finding of coverage when compared to the policy terms. *See Baumann v. Elliott*, 2005 WI App 186, ¶¶ 8-9, 286 Wis. 2d 667, 704 N.W.2d 361. Any doubt as to whether a duty to defend exists must be resolved in favor of the insured. *Elliott v. Donahue*, 169 Wis. 2d 310, 321, 485 N.W.2d 403, 407 (Wis. 1992).

**C. Coverage Provisions**

The policy[1] at issue in this case obligates Cincinnati to pay "those sums that [HCPI] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies," and to defend HPCI against any suit seeking such damages. (Rattan Decl. Ex. C, GCL Coverage Form at 1.) The policy applies only if "the 'bodily injury' or 'property

---

[1] Cincinnati actually issued HCPI two CGL policies, one effective January 1, 2001 through January 1, 2004, and the other effective January 1, 2004 through January 1, 2007. (Gill Affd. Ex. A, November 9, 2007; Rattan Decl. Ex. B, Ex. C.) Because the policies are identical in all material respects, they are referred to collectively herein.

5

damage' is caused by an 'occurrence' that takes place in the 'coverage territory' . . . during the policy period." (*Id.*) "The risk insured by a Commercial-General-Liability policy 'is the possibility that the goods, products or work of the insured . . . will cause bodily injury or damage to property . . .' not 'to make good on products or work which is defective.' *B & D Contractors, Inc. v. Arwin Window Systems, Inc.*, 2006 WI App 123, ¶ 5, 294 Wis. 2d 378, 718 N.W.2d 256 (citing *Bulen v. West Bend Mut. Ins. Co.*, 125 Wis. 2d 259, 264-265, 371 N.W.2d 392, 394 (Ct. App.1985). "Thus, costs flowing from, or caused by, the repair or replacement of an insured's defective product are not covered by the Commercial-General-Liability policy." *B & D Contractors*, at ¶ 5 (citing *Vogel v. Russo*, 2000 WI 85, ¶¶ 17-28, 236 Wis. 2d 504, 613 N.W.2d 177, overruled in part on other grounds by *Insurance Co. of N. Am. v. Cease Elec., Inc.*, 2004 WI 139, ¶ 25 n. 6, 276 Wis. 2d 361, 688 N.W.2d 462.

**1. Initial Grant of Coverage**

None of the claims against HPCI allege bodily injury. Therefore, I must determine whether Calgary alleges "damages because of . . . 'property damage.'" (*Id.*) The policy defines "property damage" as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured . . . ." (*Id.* at 19.) "[I]n examining the allegations of a complaint in relation to the terms of the disputed insurance policy, we 'liberally construe those allegations and assume all reasonable inferences.'" *Smith v. Katz*, 226 Wis. 2d 798, 815, 595 N.W.2d 345, 354 (Wis. 1999) (quoting *Doyle v. Engelke*, 219 Wis. 2d 277, 284, 580 N.W.2d 245 (Wis. 1998)).

I conclude that Calgary alleges property damage within the meaning of the policy. Although Calgary does not allege that the accumulation of the peeled Heresite within the air handling unit

6

caused any property damage, it does allege physical injury to the coils installed by Engineered Air. "[T]o the average, ordinary person, tangible property suffers a 'physical' injury when the property is altered in appearance, shape, color or in the other material dimension." *Tweet/Garot-August Winter, LLC v. Liberty Mut. Fire Ins. Co.*, 2007 WL 445988, *5 (E.D. Wis. 2007) (quoting *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 496 (Ill. 2001)). Calgary claims that the cooling coils deteriorated when the Heresite coating peeled. According to Cincinnati, such a claim alleges only a loss of economic value associated with the shortened life cycle of the coils. (Br. Supp. Mot. Sum. J. 23.) However, deterioration involves "some degeneration in the substance of the thing, such as that arising from decay, corrosion, or disintegration." Black's Law Dictionary 450 (6th ed. 1990). Thus, the damage alleged is a change in the material dimensions of the coils, not just a decrease in their value.

Cincinnati's reliance on this court's holding in *Tweet/Garot-August* is misplaced. In *Tweet/Garot-August*, this court held that the diminution in value caused by the incorporation of a defective component in a structure does not, in itself, constitute property damage. In that case, the claims at issue sought to recover the cost of repairing and replacing defective HVAC system valves which had not failed or caused physical damage. The court indicated that "[o]nly when (if ever) the component fails does the property of which it is a part suffer 'physical injury.'" *Tweet/Garot-August*, 2007 WL 445988 at *6. Here, Calgary alleges that HPCI's Heresite coating actually failed and the cooling coils were physically injured. This constitutes property damage.

In order to come under the issuing agreement of the policy, the alleged property damage must have been caused by an "occurrence." Cincinnati claims the damages alleged by Calgary are the result of a defective product, which, it argues, cannot be such an occurrence. (Br. Supp. Mot.

7

Summ. J. 25.) In support of this argument, Cincinnati cites *Glendenning Limestone & Ready Mix v. Reimer*, in which the Wisconsin Court of Appeals held that faulty workmanship is not in itself an "occurrence." 2006 WI App 161, ¶ 39, 295 Wis. 2d 556, 721 N.W.2d 704. However, the *Glendenning* court clarified that faulty workmanship "may cause, or be a cause of, an 'occurrence,' such as the leaking of windows or the settling of soil under a building . . . ." *Id.* at ¶ 30. In the present case, the failure of the allegedly defective product caused deterioration. It is that failure that constitutes the occurrence which is alleged to have caused physical injury to the coils. Thus, the policy affords an initial grant of coverage. I must therefore examine its exclusions to see whether any preclude coverage.

**2. Exclusion**s

Cincinnati claims that any alleged property damage in the underlying case falls within two exclusions to the policy. The first excludes "'[p]roperty damage' to 'your product' arising out of it or any part of it." (Rattan Decl. Ex. C, GCL Coverage Form at 5). The second specifically excludes bodily injury or property damage included within the "products-completed operations hazard" (PCOH), which, according to the policy, "[i]ncludes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"[2] (Rattan Decl. Ex. C, GCL Coverage Form at 18-19.) The parties do not dispute that the policy issued to HPCI contained these exclusions.

"As used in a liability insurance policy, the words 'arising out of' are very broad, general and comprehensive. They are commonly understood to mean originating from, growing out of, or

---

[2] Although there are some exceptions to the "products-completed operations" exclusion, neither party alleges such exceptions are relevant here.

flowing from, and require only that there be some causal relationship between the injury and the risk . . . ." *Holsum Foods Div. of Harvest States Cooperatives v. Home Ins. Co.*, 162 Wis. 2d 563, 572 469 N.W.2d 918, 972 (Wis. Ct. App. 1991) (internal citation omitted). The policy defines "your product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by: (a) You (b) Others trading under your name; or (c) A person or organization whose business or assets you have acquired," as well as containers furnished in connection with such goods, and "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your product.'" (Rattan Decl. Ex. C, GCL Coverage Form at 11-12.) It defines "your work" as "[w]ork or operations performed by you or on your behalf," as well as "[m]aterials, parts or equipment furnished in connection with such work or operations," and includes "[w]arranties or representations made at any time with respect to the fitness, quality durability, performance or use of 'your work'[] and [t]he providing of or failure to provide warnings or instructions."

Cincinnati contends that both the Heresite and Heresite covered coils are HPCI's "product," such that any damage to the coils falls within the "your product" exclusion. (Br. Supp. Mot. Summ. J. 15.) However, the statement of claim alleges Engineered Air manufactured and sold the coils (Statement of Claim ¶ 9), while HPCI's business was the design, sale and licensure of industrial coatings. (*Id.* at ¶ 5.) The use of HPCI's coating by Engineered Air did not convert the coils into HPCI's product. *See Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co.*, 281 F.2d 538 (3rd Cir. 1960) (holding that when venetian blinds were coated with defective paint that peeled, the resulting deterioration of the blinds was property damage within the paint manufacturer's insurance policy,

9

because the paint was a separate product from the damaged property.) Therefore, the "your product" exclusion does remove coverage for all of the property damage alleged.

However, Cincinnati also claims that the damage falls within the PCOH exclusion, having occurred away from HPCI's premises and arisen out of HPCI's product once that product was no longer in HPCI's possession or control. (Br. Supp. Mot. Summ. J. 9.) HPCI concedes that any allegations of damage due to a defect in its product, misrepresentations concerning its product, or a failure to warn others of a known defect fall within the PCOH exclusion. (Br. Opp. Mot. Summ. J. 7.) Yet HPCI argues that the allegations in paragraphs 23(b) and 26 of the statement of claim fall outside the PCOH exclusion and within the coverage of the GCL policy. HPCI's argument is unconvincing.

Paragraph 23(b) alleges that "HPCI . . . owed a duty of care to all foreseeable users of Heresite or Heresite-coated products . . . to take all reasonable steps to ensure Heresite was . . . licensed only to licensees who were capable of applying the Heresite coating in a manner which would allow the Heresite coating to perform as intended." Paragraph 26 claims that "[a]s soon as HPCI knew of the peeling problems with Heresite coatings," it had a duty to "stop selling Heresite and to stop its licensees from selling Heresite-coated products." Calgary claims HPCI breached these duties. (Statement of Claim ¶¶ 28-29.) HPCI argues that these allegations cannot fall within the definitions of "your product" or "your work," because they claim only a "failure to work," and "assume[] that there was nothing wrong with the product at all." (Br. Opp. Mot. Summ. J. 7.)

HPCI's interpretation of these two paragraphs is belied by the plain language of the statement of claim, which alleges without qualification that "the damages and losses [plaintiffs] have already suffered, and the future loss they will suffer . . . is directly related to the defective

10

Heresite coating." (Statement of Claim ¶ 29.) Paragraphs 23(b) and 26 allege additional theories of liability, but allege no additional property damage. That they allege negligent inaction rather than action is of no consequence. The exclusion by its terms includes claims of negligent inaction such as failure to warn. More importantly, the only property damage alleged to have resulted from HPCI's negligent licensure practices and failure to stop the sale of Heresite coated products is the deterioration of the cooling coils at Shell Centre, damage which clearly arises out of HPCI's completed product, Heresite, away from HPCI premises, after the Heresite left HPCI's control. Thus, the exclusion applies.

**III. Motion to Strike**

One issue remains. On November 26, 2007, Cincinnati filed a reply brief in support of its motion for summary judgment. On December 6, 2007, HPCI filed a letter in response. HPCI did not seek permission to file its sur-reply, although it acknowledged "there is no explicit provision for a sur reply brief by HPCI." (Docket #34.) "The local rules do not allow the non-movant to file a sur-reply or any other supplemental material as a matter of right. The case law reveals that a non-movant will only be allowed to file a sur-reply or other supplemental material upon receiving leave of court." *Boustead v. Barancik*, 151 F.R.D. 102, 106 (E.D. Wis. 1993) (citing *Nalco Chemical Company v. Hydro Technologies, Inc.*, 809 F. Supp. 672, 673 (E.D. Wis. 1992)). "Seeking permission is not a mere technicality to be overlooked or indulged by the Court." *Miami Valley Contractors, Inc. v. Town of Sunman, Ind.*, 960 F. Supp. 1366, 1371 (S.D. Ind. 1997). HPCI has provided no justification for its failure to seek leave to file the letter. Accordingly, it will be stricken as unauthorized.

11

## IV.     Conclusion

For the reasons set forth above, the court concludes as a matter of law that although at least some of the loss for which Calgary seeks to hold HPCI liable in the Canadian litigation falls within the issuing agreement of the policy, coverage is removed by the PCOH exclusion. It follows that Cincinnati has no duty under its policy to defend HPCI in that action or indemnify it for any liability it may incur. It also follows that Cincinnati did not act in bad faith in declining to accept HPCI's tender of its defense in the Canadian litigation. Cincinnati's motion for summary judgment is therefore granted. The clerk is directed to enter judgment in Cincinnati's favor dismissing HPCI's claim of bad faith with prejudice and declaring that Cincinnati has no duty under the Commercial General Liability Policy issued to HPCI to defend HPCI in Action No. 0601-11904 now pending in The Court of Queen's Bench of Alberta in the Judicial District of Calgary or to indemnify HPCI for any liability it may have arising out of such action. Cincinnati's motion to strike is also granted.

**SO ORDERED** this   7th   day of January, 2008.

 s/ William C. Griesbach
William C. Griesbach
United States District Judge